IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 08 CR 395-1 |
| ) | The Honorable David H. Coar, |
| HUGH SHEEHY, ) | Judge Presiding |
| ) | |
| Defendant. ) | |

**SENTENCING MEMORANDUM**

**I. INTRODUCTION**

On May 28, 2008, Hugh Sheehy appeared before this Honorable Court and entered a plea of guilty, pursuant to a plea agreement with United States Government, to one count of violating Title 47, United States Code, Section 605(e)(4), "Manufacture, Sale, or Distribution of Unauthorized Satellite Television Access Devices."  Hugh Sheehy is scheduled to be sentenced on August 27, 2008 by this Honorable Court.  This memorandum is submitted for consideration in light of and in addition to the Plea Agreement (District Court Document "DCD" No. 6) and the  Presentence Investigation Report ably and thoroughly prepared by Mr. Michael I. Alper of the United States Probation Department.

None of what follows in this Memorandum is intended to call into question the factual basis for Mr. Sheehy's plea or to diminish the seriousness of the offense charged, committed, and to which he pled guilty.  Rather, the purpose is to provide this Honorable Court with additional background about the history of this prosecution, Mr. Sheehy's personal, family and professional

background, and the context of the actions undertaken by him forming the basis for this prosecution.

## II.  OFFENSE, PROSECUTORIAL, AND PROCEDURAL BACKGROUND

The facts of this case start in approximately 1999. At that time, the "direct-to-home" satellite service industry was still in its relative infancy. It was around this same time Mr. Sheehy developed a growing interest in this cutting-edge technology. He began to learn about its workings and was among the first people he knew who had "DirecTV" satellite access at his home. This new technology was intriguing and exciting for Mr. Sheehy. He set out to learn how it worked and the technology involved. His curiosity and interest about this technology put him in touch with various people who offered and explained ways to enhance one's home satellite service by unscrambling the signals sent out by the DirecTV satellites. The connections Mr. Sheehy made occurred exclusively through the internet, in so-called "chat rooms."

Mr. Sheehy actively pursued this information. He got himself involved in a sort of "cat-and-mouse" game with the satellite provider. He would continually re-program his satellite access cards in order to continue to receive enhanced service over-and-above his subscription to DirecTV. He used methods and technologies he learned about and found to be widely available on the internet, specifically in certain chat rooms. With the expansion of this technology and the increased number of people who got direct-to-home satellite access, Mr. Sheehy provided these same access modifications to certain friends and family members. All of this continued until September 2, 2003, when a visit from the Federal Bureau of Investigation changed everything.

On November 22, 2005, an Information was filed in the United States District Court for the Central District of California charging Mr. Sheehy with the above-described conduct in Los

Angeles County and beyond. (See Plea Agreement, DCD No. 6; see also Presentence Investigation Report ("PSIR").) It is important to note, Mr. Sheehy never traveled in any form or fashion relative to his misconduct. The investigation into the cable piracy committed by Mr. Sheehy and others continued on and broadened with time. From the time of the first visit from the FBI, Mr. Sheehy was committed to doing the right thing and assisted the investigating authorities and prosecutors in any way he was able. In fact, his assistance helped investigators to identify several significant players and broaden the scope of the investigations into cable piracy. Though he did not personally know any of these players, his knowledge of the various individuals he encountered on-line, as well as his knowledge of the internet sites and chat rooms related to cable piracy, was instrumental to the investigation.

On May 19, 2008, pursuant to Rule 20 of the Federal Rules of Criminal Procedure, Mr. Sheehy's case was consensually transferred from the United States District Court for the Central District of California, Western Division, to the jurisdiction of the United States District Court for the Northern District of Illinois, Eastern Division. Then, on May 28, 2008, after nearly five (5) years of waiting, Mr. Sheehy was arraigned on the present charge and entered his plea of guilty thereto. Mr. Sheehy is now prepared to face the consequences of his actions and the implications for his future, both of which have been cloaked in uncertainty since September 2, 2003.

### III.  FAMILY AND PERSONAL BACKGROUND

Hugh Michael Sheehy was born in Chicago, Illinois on October 13, 1965. He is the youngest of three (3) children born to William and Kathleen Sheehy. Hugh has two (2) older sisters, Maureen and Kathleen. The Sheehys were a working-class family living in Chicago's Bridgeport neighborhood, which Hugh still calls home to this day. William Sheehy, Hugh's

father, was a train driver for the Chicago Transit Authority ("CTA"). Hugh's mother, Kathleen Sheehy, spent her career working as an accountant and bookkeeper at several Chicago law firms, including Winston & Strawn and Bell, Boyd & Lloyd.

Hugh's father passed away on September 17, 2003, shortly after Hugh's first contact with the FBI, after a long and difficult battle with Alzheimer's Disease. As is made clear in Mrs. Sheehy's letter to the Court, Hugh played an important role in the late stages of his father's illness, which sadly coincided with a fire which damaged the elder Mr. and Mrs. Sheehy's home. Hugh showed himself to be exactly what his mother always knew him to be: a loving, loyal and dedicated son. His relationship with his mother has continued to strengthen and grow through the passing of his father, the pendency of this case, and the passage of time generally.

Just as Hugh is committed to his mother and was committed to his father, he is equally committed to his wife and their three (3) daughters. On October 7, 1989, Hugh married Kimberly Donovan. Hugh and Kimberly knew each other from the neighborhood since they were in grammar school. They dated for many years and then married. Kimberly, who is trained as a court reporter, is currently employed as a Project Specialist with the CTA. In fact, she is only recently back into the work force after having stayed home with her and Hugh's three (3) daughters until 2007. Their eldest daughter, Kara, is seventeen (17) years old. She recently graduated from De La Salle High School. In the fall, she will begin her studies at St. Louis University, where she plans to study radiology. Their middle daughter, Emma, is sixteen (16) years old. This fall she will be a Junior at De La Salle High School. Their youngest daughter, Alexa, will start fifth grade in the fall of 2008. Hugh has been an active participant in the girls' lives, including volunteering with their youth basketball and volleyball teams.

Hugh Sheehy has spent his entire life in Chicago, specifically in the Bridgeport neighborhood on the near-south side of Chicago. He graduated from De La Salle High School in the Spring of 1983. From there, he went on to Richard J. Daley Community College in Chicago. After examining his interests and his academic goals, Hugh decided to pursue a course of study consistent with a life-long curiosity and interest, namely electronics. His interest in and curiosity about electronics and advancing technologies in electronics led him to the doors of DeVry Institute of Technology in Chicago. At DeVry, Hugh was able to match his interests with structured academic guidance and discipline. He ultimately earned an Associate's Degree from DeVry. From there, he obtained a job with the City of Chicago's Department of Streets and Sanitation. Over twenty-one (21) years of service to the City of Chicago, he has risen to the level of supervisor foreman. He is currently involved in the operation, maintenance, and repair of the radio communication equipment used by the City of Chicago's Department of Streets and Sanitation.

In addition to his family commitment and dedicated work for the City of Chicago, Hugh has also volunteered his time and skills to his parish, Nativity of Our Lord, in Bridgeport. He has worked on projects for the benefit of the parish and its parishioners, including installations of Christmas lights, cleaning of air-conditioning units, and installing a public address system in the basement of the church. Hugh has also lent his skills, often without charge, to friends and neighbors in need of help with electrical problems and issues in their homes.

Throughout his adult life, Hugh has continued to learn about developing technologies and improvements in technology to make him better at his job and to fulfill his intellectual curiosity about electronics and technology. It is this curiosity and interest, which has given him so much

in his life, that is at the heart of the present case and the source of the potential consequences he now faces. As his mother, as well as his mother- and father-in-law, illustrate in their letters to the Court, Hugh is at his most basic a good and decent person. He is a loyal and loving son and son-in-law, he is a loving husband, and a loving and caring father. By his own admission the acts he committed giving rise to the present case would not have been undertaken had he realized it was illegal to apply his curiosities in this fashion. This is not to say Hugh thought what he was doing was right in any form or fashion. As he said during his presentence interview with Probation, to undersigned counsel, and others, he thought and knew in his heart what he was doing was dishonest, but he never thought it was illegal. (See, for example, PSIR, page 2, lines 60-62.) To add to the pain and difficulty of his situation was the agony of having to wait "for the other shoe to drop" as it is said. It has been nearly five (5) years since the specter of prosecution and punishment first appeared before Mr. Sheehy. Only recently has an end to this difficult process finally come to light. He hopes to face the consequences of his poor choices and move forward as best he can with his head held high so that he might re-gain any trust he has lost. He looks forward to re-building the damaged portions of his life brought about by this whole long and arduous episode.

     None of the foregoing is intended in any way to call into question the factual basis for Mr. Sheehy's plea or entry of a conviction based upon it. Neither is the foregoing intended to minimize Mr. Sheehy's actions or the severity of the offense he committed. He has come to know the criminality of his actions and begun to appreciate the consequences they can and will likely bring about for him. However, understanding the person who is before this Honorable Court seems relevant and important to the process of crafting a sentence in his case.

## IV.  CRAFTING A SENTENCE

Determining an appropriate sentence in light of *United States v. Booker*, 543 U.S. 220 (2005), now more than ever calls upon the sentencing judge to seek guidance from 18 U.S.C. §3553.  Subsection (a) of this provision, "Factors To Be Considered in Imposing a Sentence," lays out seven factors for a court to consider.  Prior to setting out those factors, section (a) provides, "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider --":

> "(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> "(2)  the need for the sentence imposed –
>
>> "(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> "(B)  to afford adequate deterrence to criminal conduct;
>>
>> "(C)  to protect the public from further crimes of the defendant; and
>>
>> "(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> "(3)  the kinds of sentences available;
>
> "(4)  the kinds of sentence and the sentencing range established …
>
> * * *
>
> "(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> "(7)  the need to provide restitution to any victims of the offense."

18 U.S.C. § 3553(a)(1)-(7). Careful consideration of the facts of this case against these factors weighs heavily in favor of leniency in fashioning a sentence for Mr. Sheehy. While prior to *Booker* defendants sought "downward departures," in the context of today's sentencing philosophies the focus is more properly placed on determining an appropriate sentence based upon careful consideration of these factors. The bottom line is that the ultimate decision on how to sentence a defendant is left to a trial court's sound discretion and is reviewed for its reasonableness. See *Booker*, 543 U.S. at 260-61; see also *Gall v. U.S.*, 128 S.Ct. 586, 597-98 (2007); and *U.S. v. Arceo*, --- F.3d ---, 2008 WL 2877517, *7 (7th Cir. July 28, 2008).

The Sentencing Guidelines provide the factors contained in § 3553 to aid courts in reaching sentencing decisions. To this end, what follows is an examination of how some of these subsections mesh with the facts of Mr. Sheehy's case. As not all of the factors listed in §3553 are applicable in this case, or are of limited application, only those of general or practical application to Mr. Sheehy's case will be addressed.

Taking the first of the factors, "the nature and circumstances of the offense and the history and characteristics of the defendant," it would seem Mr. Sheehy's situation is one where leniency is appropriate. Without question, the offense committed by Mr. Sheehy is a serious one. It is one that costs direct-to-home satellite providers and their customers significant amounts of money. There are legion people across the country who commit these acts and bring about these costs. However, there is at least some measure of a difference between many of these people and Mr. Sheehy. First and foremost, Mr. Sheehy never got into these activities to make money, in fact, it seems far more likely he probably lost money when it was all said and done. The scope of Mr. Sheehy's conduct was limited to his own personal use and extended only as far as about

twenty-one (21) people – nearly all family, friends, and neighbors. All of this occurred over nearly four (4) years as alleged in the original information filed in the Central District of California. Mr. Sheehy never advertised his services. He never made any effort to broadly profit from his actions. Furthermore, Mr. Sheehy has continually expressed his view that he knew what he was doing was dishonest, but did not know it was illegal. When he learned what he was doing was illegal, it all stopped. He then and there did a 180-degree turn toward assisting in the investigation of his own case and those of other alleged satellite pirates.

     In addition to these facts, there is the fact that Mr. Sheehy has no criminal history. He is not a drinker. He is not a smoker. He is not a gambler. He is not a drug user. He is a lot of things, including son, brother, husband, father, neighbor, and friend. Mr. Sheehy is also a great example of the kind of defendant for whom the process of being accused, prosecuted, and sentenced is a powerful, meaningful and devastating deterrent. While he was never one who leaned toward criminality or malfeasance, this experience has taught him important lessons about avoiding even the appearance of dishonesty, let alone illegality. Clearly, Mr. Sheehy is the kind of defendant who committed a serious offense, but for whom significant punishment is not required to keep him from committing other crimes or having to ever again appear before this Honorable Court, or any other for that matter, as the target of a criminal accusation.

     Turning now to the second factor, as well as its sub-factors, a measure of punishment tending toward lenity is similarly appropriate in this case. There is need for a sentence in this case. About that, there is no question under the law or the terms of the plea agreement. The potential statutory and non-mandatory guideline sentences available in this case are significant. Yet, a punishment at the maximum end of those available is not required in this case. As was

discussed above, the process of going through the investigation and prosecution of this case over the past nearly five (5) years, has made clear the seriousness of the offense for Mr. Sheehy. His willingness to participate in and cooperate with the investigation of the case has similarly increased – as promoting respect for the law was not a big issue for Mr. Sheehy regardless of the present case – Mr. Sheehy's respect for the hard work and diligence of the men and women in law enforcement, from the case agents to the prosecutors from California to Illinois and beyond. The question, then, turns to providing "just punishment for the offense." The answer to this question, though left firmly in the province of this Honorable Court, seems most appropriately to fall in the range of leniency. That is to say, a sentence of incarceration is not necessary to achieve the ends of sentencing. Rather, a sentence of probation, combined with the already agreed upon restitution to DirecTV by Mr. Sheehy, would be appropriate in this case given all we know about Mr. Sheehy, specifically as evidenced by the Government's commitment to make a motion for downward departure pursuant to U.S.S.G. §5K1.1 at the time of sentencing.

      The need for a particular sentence to act as a deterrent to future criminal conduct by Mr. Sheehy is not a significant one. This has been a long and difficult road for Mr. Sheehy. It has been a sobering road. It has been a road of learning about the fine distinctions between dishonesty and illegality and where those two concepts meet in reality. The experience has made Mr. Sheehy look at his world and his actions differently. He is no longer willing to put himself in a position where his actions can even be called into question. The experience has been a deterrent of significant measure. If there was ever a sort of "economies of scale" of punishment vis-a-vis deterrence, this is the case. Any punishment along the range available from the most lenient to the most severe would provide very little in the way of difference in terms of the

benefit or the deterrent effect on Mr. Sheehy.  The added deterrent value would not increase in any meaningful way as the severity of the punishment is increased.

The same is true when it comes to protecting "the public from further crimes by the defendant."  Hugh Sheehy is not a risk to commit additional crimes.  He is in no way a risk to or danger to society.  As has been discussed throughout this Memorandum, this episode in his life was a significant deviation for him.  He knew what he was doing was dishonest.  He did not know it at the time, but now knows well, the illegality of his conduct.  He understands the costs this sort of behavior can have for himself, those people around him who love, respect, and support him, the satellite service providers, their subscribers, and the public at large.  This experience has weighed heavily on him and his family.  He would not dream of putting them through this again, nor does he want to be in such a position ever again.  As such, any punishment would achieve the goal of protecting the public, as much of the foundation for Mr. Sheehy's future conduct has been laid during the preceding four-plus years.

Then there is the consideration of "the kinds of sentences available and the sentencing range established" for the offense of conviction.  The statutory maximum for this offense is a term of incarceration of five (5) years, along with up to three (3) years of Mandatory Supervised Release, from one (1) to 5 years of probation if coupled with a fine, restitution or community service, a fine of up to $500,000, and restitution.  According the Sentencing Guidelines, taking into account Mr. Sheehy's offense and criminal history, the range of imprisonment for this offense would be ten (10) to 16 months in the Bureau of Prisons, which could involve a mix of supervised release with either community or home confinement according to §5C1.1(d).  (See Presentence Investigation Report, page 10, lines 267-270.)  In addition, the Sentencing

Guidelines provide for two (2) to 3 years of Mandatory Supervised Release.  Probation is not available according to the Sentencing Guidelines because Mr. Sheehy's range falls in Zone C of the Sentencing Table.  (See U.S.S.G. "Sentencing Table" p. 392 (2007); see also U.S.S.G. §5B1.1(a), and PSIR, p. 11, lines 287-288.)  The Sentencing Guidelines also provide for the imposition of a fine of between $3,000 and $30,000.  Like the statutory provisions, the Guidelines require an order of restitution in the instant case.

Clearly, there is a broad range of potential punishments available to impose on Mr. Sheehy.  It must be kept in mind that the Government has committed to making a motion for downward departure on the basis of substantial assistance, pursuant to §5K1.1.  So, the punishments set out above provide the outer markers for the punishments available, as there is not even a hint or reason to consider any reason to exceed these levels of punishment.  Secondly, Mr. Sheehy, as a part of his Plea Agreement, agreed to make restitution to DirecTV in the amount of $16,380.00.  Mr. Sheehy affirmatively recognized the costs associated with his conduct and how those affected DirecTV and its customers.  As such, he agreed to make this significant restitution to DirecTV in an effort to make amends for the wrongs done.

Taking all of this into account, along with the universe of information available about this case, Mr. Sheehy is a fine candidate for a sentence on the lowest possible end of the punitive spectrum.  The reasons have been expressed throughout this Memorandum.  Mr. Sheehy is a first and, there is every indication, a last offender.  While there are numerous variations and options for sentencing him, no variance tending toward increased severity will further decrease his acceptance of responsibility, unwillingness and lack of desire to commit future criminal acts, or

his sincere desire to make right the wrongs of his past. A sentence favoring leniency for Mr. Sheehy is appropriate, in light of the choices available.

## V.  CONCLUSION

Hugh Sheehy respectfully prays this Honorable Court to consider the foregoing in fashioning a sentence in his case. He respectfully submits a sentence on the side of leniency is appropriate given his background, his conduct during the pendency of this case, and his commitment to maintaining a law-abiding existence for the remainder of his days. Specifically, he submits a sentence in the range of probation, coupled with the agreed-upon restitution amount would serve the ends of justice and the purposes of sentencing in that it is "sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. §3553. See 18 U.S.C. §3553.

                              Respectfully submitted,

                                /s/ Terence P. Gillespie
                              One of his attorneys

TERENCE P. GILLESPIE
WILLIAM R. SULLIVAN
GENSON & GILLESPIE
53 West Jackson Blvd., Suite 1420
Chicago, Illinois 60604
(312) 726-9015

## CERTIFICATE OF SERVICE

I, Terence P. Gillespie, hereby certify that I caused to be electronically filed Defendant, Hugh Sheehy's Sentencing Memorandum on this 19th day of August 2008 through the CM/ECF System of the Clerk of the United States District Court for the Northern District of Illinois, which constitutes service of the same.

      /s/ Terence P. Gillespie
      One of Sheehy's Attorneys

TERENCE P. GILLESPIE
WILLIAM R. SULLIVAN
GENSON & GILLESPIE
53 West Jackson Blvd., Suite 1420
Chicago, Illinois 60604
(312) 726-9015